# CHARLESTON.

A. W. Werninger v. W. J. Stephenson *et als.*

Submitted April 23, 1918.    Decided April 30, 1918.

1. Municipal Corporations—*Assessment for Public Improvements—
   Enforcement—Defense.*

   After the completion of a public improvement for which special
   assessments may be made against property specially benefited
   thereby, and the making and confirmation of the assessments in
   the manner provided by law, without objection on the part of the
   owners of the properties assessed, the enforcement of the liens
   cannot be defeated on the ground of non-compliance with the re-
   quirements of the contract under which the work was done, if the
   omissions or deviations complained of were not of such character
   as to make the work, when completed, essentially different in char-
   acter from that ordered and contracted for. (p. 370).

2. Same—*Public Improvements—Special Assessment—Validity.*

   The substitution of a sandstone base, by a contractor, in the per-
   formance of a contract for brick street paving, calling for the
   use of gravel base, with the assent of the governing city authori-
   ties, is not such a departure from the contract as makes the com-
   pleted work different in law or fact from that ordered and con-
   tracted for, nor does it invalidate assessments for the improve-
   ment made and confirmed after statutory notice, without objection;
   the pavement so made being similar in all other respects to one
   laid on a gravel base and only slightly inferior to it, if at all, in
   convenience, utilty, permanence and value. (p. 370).

3. Same—*Special Assessment—Joint Assessment.*

   The provisions of the charter of the City of Huntington, author-
   izing special assessments against real estate, do not require assess-

ments to be made separately against two or more lots abutting on the same improved street and owned by the same person, in the absence of a demand for such assessment, if at all. (p. 376).

4. SAME—*Special Assessment—Personal Obligation of Owner—Constitutional Provisions.*

　　It is within the constitutional power of the legislature to make assessments for the cost of public improvements, against real estate specially benefitted thereby, personal obligations of the owners of the property so assessed. (p. 376).

Appeal from Circuit Court, Cabell County.

Suit by A. W. Werninger against W. J. Stephenson and others. Decree for plaintiff, and one of the defendants appeals.

*Affirmed.*

*Geo. S. Wallace, J. W. Perry,* and *Maynard F. Stiles,* for appellant.

*Strickling & Strickling* and *Holt, Duncan & Holt,* for appellee.

POFFENBARGER, PRESIDENT:

This appeal is a continuation of the resistance to a bill for the enforcement of liens for paving assessments, by the owner of the abutting property upon which they were made, on the ground of invalidity thereof by reason of a substantial departure from the contract between the city of Huntington and the contractor, in the performance thereof, or such non-performance or defective performance as suffices to invalidate the assessments, not withstanding the property owner's knowledge of the departure and confirmation of the assessment after notice, without objection on his part.

The aggregate of the amounts of the assessments involved in this suit is not large, but numerous others amounting in all to $30,000.00 or $35,000.00, are, it is said, resisted on the same grounds, wherefore very considerable amounts depend upon the result.

The paving was done under a charter clause providing for payment of the cost thereof by the abutting property owners, in five equal installments, evidenced by as many paving cer-

tificates bearing interest and payable, respectively, in thirty days, one, two, three and four years, and for sale of such certificates to the contractor doing the work or any other person. The amounts specified in the certificates are made liens on the assessed lands, lots or parts of lots, enforcible by suit in the name of the holders, and debts against the owners of the real estate, collectible in the manner provided by law for the collection of other debts. The contract out of which the certificates in question arose was made between the city and J. Ullom, who, being unable to finance the work, as it progressed, obtained advancements from the plaintiff, Werninger, in the course of the performance of his contract, and assigned to him the certificates involved in this suit, after issuance thereof.

Under the charter provisions, the power and authority of the city to grade and pave its avenues, streets, roads and alleys are very broad. Without a petition therefor, it may order any of them to be improved and assess the entire cost thereof, except that of intersections, against the land, lots and fractional parts of lots fronting thereon; and, upon the petition of the owners of property constituting not less than half of the frontage upon any street, avenue, road or alley, it may cause such improvement to be made and assess the entire cost to the abutting properties and their owners, and assume the certificates representing the cost of paving the intersections or refund it, if it sees fit to do so. It may do the work itself and its decision to perform it may be made without notice, or after publication of notice of its intention to let the work to contract and a request for bids, or after rejection of bids submitted. The Board of Commissioners are clothed with full power and discretion as to the character of the improvement to be made. They may pave with brick, wooden blocks, asphalt or other suitable material, or they may macadamize the streets, avenues, roads or alleys, or otherwise permanently improve or repair the same. The only act required in the nature of a condition precedent is the passage of an ordinance or resolution, by the Board of Commissioners, ordering the work to be done and stating the method of payment, except in those in-

stances in which the work is let to contract. When the Board
proposes to let it to contract, it is required to publish a
notice calling for bids or proposals. In such case, the city is
required to approve and adopt plans and specifications of the
work to be done, before advertising for bids, which shall be
referred to in the advertisement and the contract made. How-
ever the work is done, two methods of payment are provided
for (1), out of the city treasury, with funds to be provided
by a sale of bonds, if necessary, and (2), by the issuance of
paving certificates. The only difference in the amounts of the
assessments between an improvement made by the board upon
its own initiation and one made upon the petition of property
owners, is the inclusion of the cost of paving intersections, in
the latter case, which the city may pay or refund, or not, at
its discretion.

At the time of the award of the contract out of which the
paving certificates here involved arose, elaborate specifica-
tions of paving and other street improvements, prepared at
the instance of the Board of Commissioners, were in existence
and filed in the office of the City Engineer. On January 22,
1914, the board adopted a resolution ordering the grading
and pavement of Norway Avenue, on which the property of
the defendant abutted; the entire cost to be assessed against
the owners of the land, lots and fractional parts of lots front-
ing or bounding thereon, except the cost of paving the inter-
sections, and the work to be let to contract and done in ac-
cordance with the plans and specifications filed, and paid for
in paving certificates. The ordinance, the notice to bidders
and the contract entered into specified No. 1 vitrified paving
brick as the surface material and gravel base as the sub-
structure. On February 23, 1914, all bids received were re-
jected, and on May 1, 1914, the contract was awarded to
Ullom, at his bid of $1.92 per square yard, the paving to be
done with Athens Blocks on gravel base. The contract sub-
sequently entered into required the contractor to perform the
work according to the terms and conditions of the ordinance
and the plans, profiles and specifications on file in the office
of the City Engineer and his proposals for doing the work.
Gravel base is defined in the specifications as a bed of un-

screened gravel ballast, free from dirt and stones larger than two inch cubes, thoroughly puddled and brought to a proper crown and made hard and compact by rolling and tamping, and covered with two inches of clean sharp sand, brought to a proper crown by the use of a scraper or template of such design and construction as the engineer may approve.

The contractor did not use gravel for the base, in literal compliance with the terms of the contract, but what he did use, crushed sand stone, had been used in certain sections of the city, under paving contracts, as and for gravel, in the construction of the base, with the knowledge and acquiescence of the city authorities, contractors, property owners and citizens generally, wherefore, it is argued, the use thereof for base was authorized by the contract and specifications properly construed and interpreted. On the other hand, the correctness of this interpretation is denied, and it is insisted that not only clean sound gravel, equal to the best product of local banks, screened so as to eliminate all sand passing through a quarter of an inch screen, was contemplated. Non-compliance with the contract as to the quality of brick used is alleged by way of defense, but, as to this, the evidence is highly conflicting. Another ground of impeachment is the alleged disparity between the value of the work as done and its value as contemplated and contracted for. Many witnesses swear to its serious defectiveness, saying it is uneven, undulating or fluctuating, insecure and unstable, while others testify with equal emphasis, that the pavement is in good, sound and durable condition, and is as good or better than a pavement laid on a gravel base would have been.

The findings of the commissioner and the trial court as to the condition in which the completion of the work put the street, the character of the surface, its convenience, utility and value, and the quality of the brick used, are so well sustained by evidence that they cannot be disturbed. With one or two exceptions, the witnesses testifying for the defendant were persons who are resisting like or similar assessments for paving, against their properties, and who have entered into an agreement to share the burden and expense of resistance of the efforts to enforce the liens claimed under the assess-

ments.  Some of the city commissioners, engineers and inspectors and several contractors testified for the plaintiff. The former class vigorously denounced the general results of the work, giving it as their opinion, that it was seriously defective and that the street would have to be repaved in a short time, but their specifications of defects in the surface do not disclose any thing more than irregularities, lack of solidity and looseness of some of the bricks.  The witnesses for the plaintiff, some of whom have gone over the work under all conditions of weather, say the paving compares favorably with that done on gravel base in other sections of the city, and that the sand stone base used in some older work has been found equal, and, in some respects superior, to the gravel base.

They admit a defect at the intersection of Grace Street and Norway Avenue, due to an excavation made in securing sand used in the work, and lack of sufficient tamping in the filling thereof.  This section of the pavement has been relaid but it is still defective by reason of an insecure foundation.  One of the witnesses for the plaintiff admits a sloppy condition of the pavement at the intersection of Gallia Street and Norway Avenue due to lack of sufficient drainage at that place. A defect at another point due to lack of sufficient tamping is admitted, but it has been remedied.  The evidence of the city officials as to the general condition and value of the pavement is supplemented by that of numerous witnesses who have no special interest in the improvement or the controversy arising out of it.  The engineers admit that a concrete base would have given better results, but they all insist that the pavement is in as good or better condition than it would have been if the specifications calling for gravel base had been complied with.

Though some of the witnesses for the defendant say the bricks used were soft and are crumbling, a very decided preponderance of the evidence is to the effect that they were not soft and crumbling, but that, on the contrary, they are brick of the kind and quality extensively used in street paving, and beyond some slight chippings at the corners and edges, they show no indications of defectiveness.  Bills filed as exhibits

with the evidence of the contractor indicate that they were bought and paid for as Athens No. 1 Blocks, the kind called for by the contract.

For the base, about eight inches of soft native sand stone was used, with the consent of the engineers, the inspectors and the commissioners. The specifications were prepared and filed some years before the letting of the contract. They provided for three kinds of base, gravel, concrete and macadam. In the extention of the pavement to the upland sections of the city, where the stone is found, it was discovered that it gave as good or better results than the gravel usually specified in contracts. Without amendment of the specifications so as to provide for a sand stone base, it has been the practice to contract for a gravel base, the nearest thing to it, and then orally permit the substitution or use of the sand stone. At the time of the letting of the contract in question, the bidders were advised they would be permitted to use this stone, if they prefered to do so. The deviation from the literal terms of the contract is unduly emphasized in the argument by an untenable claim and contention as to the character of the gravel called for in the specifications. For gravel base, unscreened gravel ballast is designated. The clean, sound, screened gravel, equal to the best product of the local banks, is plainly required for use in concrete, not gravel base. It is found in the designation of materials, after the general heading "Concrete Base," and just before the specifications for macadam base. As the specification for gravel base expressly designates unscreened gravel ballast and impliedly allows the use of stones not larger than two inch cubes, the call in another place for clear, sound, screened gravel, manifestly has no connection with the designation of materials for gravel base.

There is also a conflict in the testimony as to the quality of the sand stone used, a specimen of which, said to have been taken from the base on Norway Avenue, was exhibited to the commissioner to whom the cause was referred. A civil engineer testifying for the defendant and producing the specimen pronounced the material bad and wholly unsuitable for the purpose for which it had been used. Against his testi-

mony stands that of other witnesses, the city engineers, the city inspector who passed upon the quality of the stone put in, the contractors and some of his employees and numerous other persons saying the base sustains the pavement as well or better than gravel base used on other streets.

Though neither the pleadings nor the evidence indicates clearly the date of the confirmation of the assessments, it seems to be conceded that no formal complaint was made or attempted by the property owners assessed, until after that date. The defendant says he made certain inquiries in the nature of protests, of the inspector in charge of the work and also one of the commissioners, but this testimony is denied, and, if it is true, he seems to have acquiesced in the explanations and assurances given. He did not then nor before the confirmation of the assessment, make any objection nor complaint to the Board of Commissioners. His uncontradicted testimony shows that he and others made a demand for an abatement, October 25, 1915, but the assessments were reported in July, 1915, and the certificates here involved, issued, August 5, 1915. The assessments were no doubt confirmed on some day between said last two dates.

In the absence of proof of fraud or bad faith, or such a radical and manifest departure of the work done from that ordered and contracted for, as makes it substantially an improvement different in general character from the one contemplated, one not ordered nor contracted for, acceptance of the work by the city or other public corporation for which it is done, is held, by the great weight of authority, to be final and conclusive. ''In accordance with the theory already given as to the effect of the acceptance of work by the city or other public corporation, it has been said that if the public corporation has accepted the work as being in proper performance of the contract under which the improvement has been constructed, the question of actual performance as a matter of fact is immaterial, if it cannot be shown that in accepting the work the proper officials were guilty of fraud or bad faith.'' Page & Jones, Taxation by Assessment, sec. 532. ''It is held in some jurisdictions that if an improvement has been constructed to the satisfaction of the public authorities and has

been accepted by them, defects in performance are no defense to the assessment, unless the improvement is a different one from that which was contracted for.'' Page & Jones, Taxation by Assessment, sec. 533. Cooley on Taxation asserts the same general rule and the exception thereto. 3rd Ed. pp. 1280-1283. To review the decisions upon which the text is founded would involve an unnecessary consumption of time and labor.

It is sometimes difficult to distinguish between substantial performance accepted by the city and a departure amounting to the substitution of one improvement for another which cannot be made binding by an acceptance, but it is obvious that the improvement for which these assessments were made does not depart from the one ordered in respect of location or general character. It is a street paved with brick of the kind and quality ordered and contracted for, as determined by a decided preponderance of the evidence. In respect of durability, utility, value and convenience, it may fall somewhat short of the expectations of the owners of the abutting property, but, as to this, there is no preponderance against the finding of the trial court. There was a departure only in the matter of the material used in the base, and what was used could have been provided for in the contract and specifications. Believing it to be as good or better than that actually specified, the city authorities have accepted the work. Such departures do not invalidate. A five inch gutter and curb may be accepted under a contract calling for six inches. *Chicago* v. *Sherman,* 212 Ill. 498. The use of less cement than is specified, a kind other than that specified, lime screenings in place of sand and failure to plaster curb walls as required, do not invalidate. *People* v. *Whidden,* 191 Ill. 374. Although the cement used is inferior and the sidewalk two or three inches shorter than that provided for and made of softer stone, the work is the same as that contracted for. *Marshall* v. *People,* 219 Ill. 99. A departure as to location or general character is fatal and incurable by acceptance. What is virtually a dirt road cannot be accepted under a contract calling for construction of macadam road. *Gage* v. *People,* 200 Ill. 432, 193 Ill. 316. If the grade is changed

so as greatly to increase the cost, the improvement is regarded as a new one. *Eustace* v. *People,* 213 Ill. 424. These holdings suffice for illustration of the rule and its exception.

The notice and contract may have been intended to subserve and protect the interests of the owners of the assessed properties as well as those of the city and the general public, and such owners may have had the right to compel full compliance with its terms, but, if so there is good reason for requiring timely exercise thereof. The law vests authority in the city to raise funds by means of assessments against their property for the construction of a work by which they are pecuniarily benefited and in which they have a special or peculiar interest. If they may intervene by injunction or otherwise, during the progress of the work, to prevent departures from the contract, in minor respects, it does not follow that they may forego such right, remain passive and quiescent until the work has been completed at heavy expense and then take the benefit of the improvement as made and refuse to pay their just proportions of the costs. Where such right of intervention is admitted and recognized, it must be exercised before confirmation of the assessment or not at all. *People* v. *Whidden,* 191 Ill. 374; *Fisher* v. *People,* 157 Ill. 85; *People* v. *Green,* 158 Ill. 594. The right to intervene while the work is in progress affords them ample protection and to permit then to avoid the assessments after completion and acceptance would result in great injustice to taxpayers and unfairness to the authorities charged with the execution of the city's powers as well as the contractors.

Here there is not the slightest evidence of any fraud or lack of good faith on the part of the commissioners or the contractor, and the work done is substantially the same as that contracted for.

The objection that two lots were assessed jointly is untenable. Nothing in the charter requires separate assessment of adjacent lots owned by the same person and the court cannot read such a requirement into it. *Hager* v. *Melton,* 66 W. Va., 62, 72.

Nor was it beyond legislative authority to make the as-

sessments personal debts against the owners of the properties assessed. *St. Mary's v. Locke*, 73 W. Va., 30.

For the reasons stated, the decree complained of will be affirmed.                                               *Affirmed.*